# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **FÉLIX JAVIER ROSADO COLÓN**, PLAINTIFF, <br><br> v. <br><br> **UNITED STATES OF AMERICA**, DEFENDANT, | **CIVIL NO. 25-1426** |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** the Plaintiff Félix Javier Rosado Colón, through the undersigned attorney and respectfully states, alleges and prays as follows:

### I. JURISDICTION AND VENUE

**1.**  This action is brought pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §1346(b), §1402(b).

2.  Venue is proper in this Court under 28 U.S.C. §1402(b) because the plaintiff resides in this district and the acts and omissions giving rise to this action occurred in this district.

**3.**  On November 4, 2024, Plaintiff filed a formal administrative claim with the relevant federal agencies as required by 28 U.S.C. § 2675(a). The agencies failed to make a final disposition of the claim within six months. Therefore, the Plaintiff's administrative remedies have been exhausted.

### II. REQUEST FOR JURY TRIAL

4.  Plaintiff requests trial by Jury.

### III. PARTIES

5. Plaintiff Félix Javier Rosado Colón is of legal age, married with prenuptial agreement, resident of Vega Alta, Puerto Rico, with the following address: PR 6678, KM 2.6, Sector Villa Monte, Barrio Maricao, Vega Alta, PR00692 with postal address: PO BOX 5029, Vega Alta, PR 00692.

6. Defendant United States of America is a country that can be sued pursuant to the FTCA. USA is liable for the gross negligent and intentional acts of the US Department of Homeland Security Immigration and Customs Enforcement Homeland Security Investigations and the DEA.

### IV. STATEMENT OF CLAIM

7. Plaintiff Félix Javier Rosado Colón ("Mr. Rosado") is an adult resident of Vega Alta, Puerto Rico.

8. Until his wrongful arrest, Plaintiff Félix Javier Rosado Colón ("Mr. Rosado") was a law-abiding citizen with no criminal record. He was a dedicated employee, a husband, and a father.

9. From 2005 until April 11, 2017, Mr. Rosado was a valued employee of United Parcel Service (UPS), where he worked as a delivery driver. His 2016 W-2 form confirms a certified annual income of $110,479.00.

10. Mr. Rosado's assigned delivery routes never included the airport or any location involving international or federal cargo clearance.

11. His job responsibilities did not include inspecting, authorizing, or managing packages received at ports or airports.

12. UPS does not assign its drivers any responsibility over x-ray inspection or verification of package contents.

13. Packages destined for delivery were preloaded into Mr. Rosado's assigned truck by warehouse personnel prior to his daily shifts.

14. Mr. Rosado would only enter the vehicle and begin his delivery route once the truck had been loaded.

15. He had no access to, control over, or operational involvement in any facility responsible for receiving packages from the mainland United States or forwarding them out of Puerto Rico.

**A. The Wrongful Arrest**

16. On April 11, 2017, at approximately 4:30 a.m., federal law enforcement agents from ICE-HSI and the DEA conducted an arrest operation at Mr. Rosado's home.

17. On April 11, 2017 -a date seared into his memory as it was the birthday of his only son, Javier José- Mr. Rosado's life was irrevocably shattered.

18. At approximately 4:30 a.m., armed federal agents from ICE, HSI, and the DEA forcibly entered his residence in Vega Alta, Puerto Rico.

19. The agents forced open the front door, causing damage to the property.

20. They stormed into Mr. Rosado's bedroom with long guns drawn and violently removed him from his home in front of his elderly parents, Félix Rosado Pantoja, a United States veteran, and his mother.

21. His parents witnessed this traumatic moment in shock. When his father asked why they were arresting his son, whom he described as a Christian and a preacher of God's word, an agent callously replied, "Your son is a drug trafficker".

22. Deeply hurt and offended, his father retorted that the agent was a liar.

23. The arresting agents failed to read Mr. Rosado his Miranda rights at his home.

24. He was transported to the Luis Muñoz Marín International Airport without being given any reason for his arrest, despite his repeated inquiries.

25. It was only after arriving at the airport that two agents took him to a private room, read him his rights, and informed him of the charges.

26. In a state of shock and disbelief, Mr. Rosado immediately asserted his innocence, stating the agents were making a grave mistake.

27. To prove his innocence, Mr. Rosado immediately demanded a polygraph test, consented to a urine test, and offered unrestricted access to his financial records, declaring he had nothing to fear or hide. The agents ignored his pleas.

28. The basis for this devastating arrest was a single piece of evidence: a voice recording of a phone conversation that federal agents claimed was Mr. Rosado. As it was later proven, the voice was not his.

29. Federal agents illegally, with gross negligence and recklessly presumed, without any evidence, that such recording was Plaintiff's voice.

30. To compound his humiliation, members of the press were present at the airport to photograph Mr. Rosado in custody. These images were published on the front page of newspapers and broadcast on television, causing him significant public shame and reputational damage.

**B. The Malicious Prosecution**

31. The criminal case, docketed as *United States v. Rosado-Colón*, No. 3:17-cr-00240-SCC-23, was initiated and continued without probable cause.

32. The sole piece of evidence tying Mr. Rosado to the case was an audio recording of a phone conversation involving a package of sham cocaine, in which Mr. Rosado's voice did not appear.

33. Despite the lack of credible evidence, agents submitted this recording to a federal grand jury to obtain an indictment.

34. A cooperating witness informed prosecutors that the voice in the recording was not Mr. Rosado.

35. Federal agents nevertheless presented the recording to the grand jury as if it implicated Mr. Rosado.

36. On April 12, 2017, the day after his arrest, UPS terminated Mr. Rosado's employment of nearly 13 years. The termination letter stated the cause was his violation of Article 15, Section 1-A of the Collective Bargaining Agreement for being "arrested by the Federal authorities for being engaged in the traffic, sale, and possession of illegal drugs".

37. Throughout the prosecution, Mr. Rosado lived under a cloud of false accusation. Evidence of the government's bad faith is documented in the court record.

38. In a motion filed October 27, 2020 (Doc. 1003), defense counsel stated that AUSA José A. Contreras had offered to perform a biometric voice test after a cooperating witness provided exculpatory testimony, but the government later reneged on this offer.

39. During a status conference on February 4, 2020, the government formally announced it would not conduct the voice identification test. As documented in the court minutes (Doc. 878), the Court then instructed Mr. Rosado's retained counsel to file a motion for CJA funds to have the test performed, as Mr. Rosado could not afford it. The government then engaged in

further procedural delay by refusing to designate the specific audio files it alleged contained Mr. Rosado's voice, making it impossible for the defense to proceed with the test.

40. At one point, the prosecution offered Mr. Rosado a plea deal for two years of probation. Standing before the Honorable Judge, Mr. Rosado fearlessly rejected the offer, reaffirming his complete innocence.

41. Upon finally hearing the recording, Mr. Rosado confirmed that the voice did not belong to him.

42. Finally, on September 8, 2023, the government administered a polygraph examination at the FBI building.

43. During the exam, Mr. Rosado explained that he never had access to the restricted areas of the airport or UPS facilities, nor did he handle packages in the manner described in the audio. He noted the voice on the recording was not his and that the person identified as "José," while his name is Félix Javier.

44. The polygraph test served as exculpatory evidence, confirming Mr. Rosado was telling the truth.

45. On September 14, 2023, after six years and four months of suffering, the criminal case against Mr. Rosado was dismissed without prejudice.

**C. Devastating and Ongoing Damages**

46. As a direct and proximate result of the Defendant's wrongful actions, Mr. Rosado has suffered catastrophic, life-altering damages.

47. As to the Economic Damages: a. Loss of Career and Income**:** Mr. Rosado lost his $110,479-per-year career at UPS. Due to the nature of his termination, he cannot list nearly 13 years of work experience on his résumé. His 2018 W-2 shows his income plummeted to $20,363

annually in a construction job, where he remains with no family medical insurance or 401(k) plan. b. Denial of Benefits: In a letter dated June 16, 2017, Assurant denied his claim for involuntary unemployment insurance. The denial stated that his policy did not provide coverage for job loss "occurred as a consequence of the [criminal] conduct," leaving him without a critical financial safety net. c. Depletion of Assets: To pay for legal fees and survive financially, Mr. Rosado was forced to liquidate his entire 401(k) retirement savings and sell his classic 1986 Porsche 928. d. Familial Debt: His father, a U.S. veteran, was forced to take out two personal loans to help his son with living expenses and medical needs.

48. Regarding Plaintiff Rosado's Physical and Emotional Damages: a. Mental Health Decline: Previously healthy, Mr. Rosado was referred for psychological treatment by U.S. Pretrial Services. A Treatment Services Plan dated June 25, 2019, notes that Mr. Rosado "reported to feel very depress and very anxious due to his legal case" and even "reported some sporadic hallucinations". Since 2019, he has required government-funded psychological treatment for these conditions. b. Physical Health Deterioration: He now suffers from high blood pressure and is overweight, conditions diagnosed as a direct result of the prolonged stress and uncertainty. c. Family Health Impact: The stress from the arrest and its aftermath caused a decline in the health of his parents. Furthermore, his wife was forced to cancel a necessary gastric surgery due to the loss of the family medical plan provided by UPS, resulting in ongoing knee problems for her.

49. In fact, Plaintiff Rosado is still with his ongoing harm: a. The damage to his record is permanent and ongoing. On March 14, 2025, a Police Record Check conducted for access to a worksite at Fort Buchanan, Puerto Rico, resulted in "Access Denied" due to the record of his federal arrest for "Possession and distribution of control substance" This situation persists, jeopardizing his current employment. b. He is unable to obtain a U.S. passport due to the damaged

7

record, restricting his freedom of movement. c. The anniversary of his son's birthday is no longer a celebration but an annual, painful reminder of the traumatic day he was wrongfully arrested.

## V. CAUSE OF ACTION:
### MALICIOUS PROSECUTION AND ABUSE OF PROCESS PURSUANT THE FEDERAL TORTS CLAIMS ACT AND WIFE'S CLAIM

50. The allegations contained all in previous paragraphs are re-alleged as if fully alleged herein.

51. The Defendant, through its agents and prosecutors, initiated and continued the criminal prosecution of Mr. Rosado not merely without probable cause, but in the conscious and deliberate absence of probable cause. The government's sole purported evidence was a single voice recording. From the moment of his arrest, Mr. Rosado vehemently denied it was his voice and offered to immediately submit to a polygraph and voice analysis. More critically, the government was put on affirmative notice that its evidence was false when a cooperating witness directly informed prosecutors that the voice on the dispositive recording was not Mr. Rosado's. Despite this exculpatory information, which fatally undermined any good-faith basis for the prosecution, the Defendant's agents and prosecutors deliberately proceeded with the case for several more years, demonstrating a reckless disregard for the truth and for Mr. Rosado's constitutional rights.

52. The Defendant's malice is manifest in a continuous course of conduct demonstrating a reckless and callous disregard for Mr. Rosado's rights and liberty, consistent with the standard articulated by the First Circuit in *Lozada-Manzano v. United States*. This malice is evidenced by, among other things: (a) the agents' deliberate act of orchestrating a media 'perp walk' at the airport, an action with no legitimate law enforcement purpose, designed solely to publicly humiliate and brand Mr. Rosado as a criminal before any adjudication of guilt ; (b) the agents' cruel and baseless statement to Mr. Rosado's veteran father that his son was a 'drug trafficker,' intended to inflict

maximum emotional distress ; (c) the government's steadfast, multi-year refusal to conduct a simple, dispositive voice analysis test, despite Mr. Rosado's immediate and repeated requests, demonstrating a willful blindness to the truth and an intent to prolong the prosecution on the basis of evidence known to be flawed ; (d) the prosecution's bad-faith act of retracting a formal offer to conduct a biometric voice test after being confronted with exculpatory information ; and (e) the government's subsequent obstruction of the defense's own efforts to conduct the test by refusing to designate the specific audio recordings at issue. This pattern of behavior, stretching over more than six years, cannot be explained by negligence or mistake; it can only be understood as a malicious campaign to secure a conviction at any cost, regardless of actual innocence.

53. The criminal proceedings were terminated in Mr. Rosado's favor when the case was dismissed.

54. Furthermore, the Defendant's agents and prosecutors committed the tort of abuse of process by weaponizing the criminal justice system for an improper, collateral objective, as defined by the First Circuit in *Gonzalez-Rucci v. United States,* 405 F.3d 45 (1st ci. 2005). The proper purpose of a criminal prosecution is to seek justice and convict the guilty. Here, the Defendant used the process for the ulterior purpose of coercing a guilty plea from a man its agents knew to be innocent. This improper objective is evidenced by the government's offer of a lenient two-year probation sentence for a serious trafficking charge, an offer transparently designed to induce Mr. Rosado to abandon his claim of innocence in order to escape the enormous financial and emotional burden of a multi-year federal prosecution. The Defendant's goal was not justice, but securing a disposition that would conceal its own agents' tortious conduct, validate their initial wrongful arrest, and avoid accountability for the catastrophic harm inflicted upon Mr. Rosado and his family.

55. The Defendant's agents were negligent in their investigation, failing to exercise reasonable care in identifying the correct suspect, which led directly to the wrongful arrest and prosecution of Mr. Rosado.

56. Mr. Rosado had no history of mental health treatment prior to his arrest. Following the trauma of the arrest and prosecution, he was evaluated and treated at the Santa Cruz Therapeutic Clinic by social worker Rubén Vélez. Mr. Vélez confirmed that Mr. Rosado had no pre-existing mental health record and was required to file a formal motion with the court to obtain judicial authorization for a psychological evaluation, as none could be approved administratively due to the absence of prior history.

57. As a result of this event, Mr. Rosado developed elevated stress levels, frequent headaches, high blood pressure for which he now receives medication, and weight-related issues he had never previously experienced. He also suffers from gastrointestinal complications and stomach disorders directly associated with chronic anxiety.

58. Mr. Rosado's father, a retired U.S. military veteran, was forced to take out personal loans on two occasions to assist with his son's medical and financial needs arising from the wrongful arrest and termination.

59. Following the public and unfounded accusation of drug trafficking, Mr. Rosado was terminated by UPS with the justification that he could not remain employed after "abusing the company's trust and using a UPS truck for narcotrafficking," a claim entirely unsupported by facts. Mr. Rosado had nearly 13 years of unblemished service and had anticipated retiring from UPS with a monthly pension of over $4,500.00, a full 401(k), and comprehensive medical coverage including dental and major medical benefits, all paid by UPS.

60. Mr. Rosado is now unable to list UPS as a prior employer on his résumé because if contacted, the company will state that he was terminated for cause. He has no way to explain nearly 13 years of prior employment without risking further reputational harm.

61. After his release, Mr. Rosado faced repeated rejections during job searches. Despite explaining that the accusations were false and the charges dismissed, employers refused to hire him due to the arrest record. Only after six months was he offered a position with a construction company where he remains employed today, earning less than one-quarter of his prior salary and receiving no medical benefits or retirement plan.

62. Plaintiff Rosado reaffirms that the damages claimed in this action reflect the full extent of the emotional, physical, economic, and reputational harm suffered, and respectfully requests that the Court consider the magnitude of these injuries when awarding damages.

63. The claim for $1,000,000 in economic damages is substantiated by breaking it down into several distinct, quantifiable components based on the losses Mr. Rosado suffered. While a forensic accountant will be needed to calculate the precise value of future losses, the following breakdown of past losses demonstrates the basis for the claim :

(a) Lost Salary: The largest component of economic damages is lost salary. Based on the difference between his annual UPS salary of $110,479 and his current annual income of $20,363, his past lost wages from April 2017 to August 2025 are estimated to be approximately $720,000. An expert will be needed to calculate the full extent of future lost income.

(b) Lost 401(k) & Pension: Mr. Rosado lost significant retirement benefits, which includes the projected value of his pension and the lost employer matching contributions to his 401(k) plan. The calculation of these past and future losses will require an expert analysis.

(c) Value of Lost Benefits: He and his family lost a comprehensive medical, dental, and major medical plan that was previously paid for by UPS. Estimating the value of this plan at $15,000 per year, the past losses for these benefits amount to approximately $120,000.

(d) Depleted Assets: To pay for legal fees and living expenses, Mr. Rosado was forced to liquidate his entire 401(k) retirement savings and sell his classic Porsche automobile.

64. Plaintiff complied with the administrative exhaustion requirement of 28 U.S.C. § 2675(a) by filing a written claim with the appropriate federal agency on November 4, 2024. As of the date of this filing, more than six months have passed without final agency disposition, thus entitling Plaintiff to file this action in federal court.

## VI. RELIEF

65. Wherefore, Plaintiff prays that this court enter judgment in favor of plaintiff and against defendants and:

66. Award Compensatory Damages for Plaintiff Félix Javier Rosado Colón in an amount not less than **$5,000,000.00**, composed of:

a. Economic Damages in an amount to be proven at trial, but estimated to exceed $1,000,000.00, for all past and future lost income, lost employment benefits, including the value of the pension and 401(k), the value of depleted assets, and other pecuniary losses directly and proximately caused by the Defendant's tortious conduct.

b. Non-Economic Damages in an amount not less than $4,000,000.00 for the catastrophic and permanent harm suffered, including: i. Past and future physical pain and suffering, including the development of chronic hypertension and other stress-induced physical ailments; ii. Past and future mental and emotional distress, including but not limited to severe depression, anxiety, PTSD, and humiliation, an award justified by the First Circuit's damages framework in *Limone v. United States*, 579 F.3d 79 (1st Cir. 2009);

iii. Loss of enjoyment of life, including the destruction of his family's peace and the conversion of his son's birthday into an annual reminder of trauma; and iv. Permanent damage to his reputation, good name, and standing in the community, which continues to prevent him from obtaining commensurate employment and full participation in society.

c. An award of costs, litigation expenses, and reasonable attorney's fees as permitted by law.

d. Such other and further relief as this Court deems just and proper.

67. Provide for the payment of all applicable interests, including prejudgment interest, together with reasonable attorney's fees, litigation expenses and the costs of this action.

68. Grant plaintiff such other and further relief as the Court may deem appropriate and proper and retain jurisdiction over this action in order to assure full compliance with any decree issued by this court.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this August 8, 2025.

**BELLVER ESPINOSA LAW FIRM**
Condominio San Martín,
1605 Ponce de León Ave., Suite 300,
San Juan, Puerto Rico 00909-1822
Tel.: (787) 946-5268

*s/Alejandro Bellver Espinosa*
Alejandro Bellver Espinosa, *Esq.*
USDC-PR No. 225708
alejandro@bellverlaw.com